UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 6:15-CR-00113

VERSUS                            JUDGE HAIK

CAREY WARDELL REED                MAGISTRATE JUDGE HANNA

## REPORT  AND  RECOMMENDATION

Currently pending is the motion to suppress, which was filed by the defendant, Carey Wardell Reed.  (Rec. Doc. 23).  An evidentiary hearing was held on December 17, 2015.  Lt. Graig LeBlanc of the Opelousas Police Department testified for the government.  No witnesses testified for the defendant.  Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the motion be denied.

### FACTUAL BACKGROUND

On the night of May 2, 1014, a Valero gas station referred to as Tiger Stop No. 2, located on West Vine Street in Opelousas, Louisiana, was robbed.  A man entered the gas station, brandished a handgun, and fired a shot toward the front counter while demanding money.  Eye witnesses to the crime described the robber as a black male with eyeglasses and a bandana around his face.  The eye witnesses described the handgun as being black in color.  The robbery was captured on video and on audio.

The videotape showed the handgun as being a black semi-automatic weapon with a light attachment on it.

On the night of May 10, 2014, a restaurant called Chicken King, which is located on East Prudhomme Street in Opelousas, Louisiana, was robbed at about 10:00 p.m.  A man entered the restaurant, brandished a handgun, and demanded money.  According to the eye witnesses, he was a tall black man wearing eyeglasses, and he had a bandana around his face.  Eye witnesses described the handgun as being black and having a light on it.  The second robbery was also captured on videotape.

When the two videotapes were compared by law enforcement officers, it appeared that the same suspect robbed both the gas station and the restaurant since both robbers were tall black men wearing eyeglasses and the handguns appeared to be the same.

On September 22, 2014, the Family Dollar Store on West Vine Street in Opelousas, Louisiana was robbed at about 9:00 or 10:00 p.m.  A man entered the store, brandished a handgun, and demanded money from the cashier.  Eye witnesses described the robber as a tall black man wearing eyeglasses.  The robbery was captured on videotape.  The man on the tape of the third robbery appeared to be a physical match for the man in the first two robberies.

Law enforcement agents obtained surveillance tapes from two cameras outside a professional office (possibly a doctor's office) about a block away from the Family Dollar Store on the night that it was robbed.  These videos were entered into evidence as Government Exhibit No. 1, Tracks 1 and 2.  The videos show a red truck with distinctive chrome rims, high intensity headlights, and license plates on the front as well as the back ( indicating that it was not registered in Louisiana, which requires only a rear license plate), entering the parking lot.  A person emerged from the diver's side of the truck and walked away.  A few minutes later, that person returned, got in the truck, the headlights came on, and the truck drove away.  A gentleman who lives across the street from the doctor's office called law enforcement to report that he was awakened by the truck's headlights.  He noticed the truck in the parking lot and found that to be unusual.

Based on his experience in law enforcement, and after comparing the videotapes of the three robberies and reviewing the witness statements, Lt. LeBlanc concluded that the person in the truck was likely involved in the robberies.  A BOLO – or be-on-the-lookout notice – was issued for the truck.

On September 30, 2014, Lt. LeBlanc and Opelousas Police Officer Pickens were on an errand when they observed a red truck matching the description used in the BOLO, exiting the interstate in Opelousas.  Without putting on his lights or using

his siren, Lt. LeBlanc followed the truck, which stopped in the parking lot of Opelousas High School.  By the time Lt. LeBlanc and Officer Pickens arrived at the high school, the truck's driver, later identified as the defendant, Carey Reed, was out of the truck and walking toward the school building.

Lt. LeBlanc and Officer Pickens exited their unit, made contact with Reed, and explained that they suspected that his truck had been used in an armed robbery.  Reed replied that it must have been his brother-in-law, later identified as Antonio Seraile, who had used the truck in the robbery because Seraile sometimes drives the truck.

Reed explained that he was at the high school to pick up a transcript to be used in applying for a job.  The officers permitted him to complete this errand.  The officers did not restrict Reed's movements or tell him that he could not leave.

When Reed exited the school building, they again engaged him in conversation concerning the truck and the robbery at the Family Dollar Store.  Lt. LeBlanc observed that Reed fit the description of the robber in that he is a tall black male who wears glasses.

Lt. LeBlanc asked Reed if he had a weapon in the truck, and Reed stated that he did.  Lt. LeBlanc called and requested that Captain Guidry come to the high school because he wears a body camera and is Lt. LeBlanc's direct supervisor.  Once Capt. Guidry arrived, his body camera captured the officers' interaction with Reed.  Capt.

-4-

Guidry was with Opelousas Police Chief Perry Gallow at the shooting range, so Chief Gallow accompanied Capt. Guidry to the high school.  A female officer also named LeBlanc also arrived at the high school.

The video from Capt. Guidry's body camera was entered into evidence as Government Exhibit 2.  The video from the body camera shows Lt. LeBlanc holding the defendant's driver's license and recapping his earlier conversation with the defendant, stating that the defendant told him he was from Houston, works two jobs, has no criminal record, and sometimes allows his brother-in-law Antonio Seraile to drive the truck.  Lt. LeBlanc stated that the defendant had told him that there was a black .40 caliber handgun in the vehicle.  Lt. LeBlanc described the defendant as cooperative.  On the tape, the defendant is shown conversing with the officers and using his cell phone.  He states that he is willing to go to the police station with the officers to answer their questions.  Lt. LeBlanc explains to the defendant that they would prefer that he not drive his vehicle because they want to avoid the possibility of a pursuit.  The defendant requests that Officer Pickens drive his truck.  Lt. LeBlanc also explains to the defendant that they want to remove the weapon from the vehicle. The defendant offers to retrieve the handgun, but Lt. LeBlanc asks permission for the officers to retrieve it instead.  The defendant consented, and he told the officers that the handgun was on the back seat.  Officer LeBlanc opened the rear driver's side door

and located the handgun wrapped in clothes on the back seat.  The defendant then gave his keys to Officer Pickens, who drove the truck to the police station.  Lt. LeBlanc then patted down the defendant, and the defendant rode with Lt. LeBlanc in the front seat of his vehicle to the station.

Lt. LeBlanc was transported to the Opelousas Police Department's CID office in the front seat of Lt. LeBlanc's vehicle.  Officer Pickens drove the defendant's truck to the same location.  Once at the CID office, a search warrant was prepared and the truck was searched.  Reed was read his *Miranda* rights, and he indicated that he was willing to give a statement and answer questions at that time.

Seraile later arrived at the CID office along with his sister, the defendant's girlfriend.  Lt. LeBlanc immediately observed that Seraile's physique did not match that of the robber, since he is "very skinny" like a "beanpole."  Seraile told the officers that the defendant had stopped letting him use his truck several months previously and that text messages on his sister's cell phone would confirm that fact. His sister gave her permission for the officers to view the text messages on her phone, which did confirm that Seraile had not been permitted to use Reed's truck for a period of months.

A search of the vehicle, conducted after a search warrant was obtained, led to the discovery of clothing and money.

The defendant now argues that his constitutional rights were violated during his encounter with the police officers, and he seeks to suppress all of the evidence resulting from the search of truck, alleging that the evidence was obtained through the violation of his constitutional rights.

## CONTENTIONS OF THE PARTIES

Reed contends, first, that the officers did not have a justified basis to stop his vehicle; second, that the traffic stop was unconstitutionally extended; and third, that the warrantless search of his vehicle was unconstitutional.

The government contends that the police officers conducted an investigatory stop that did not violate the defendant's rights.

## ANALYSIS

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures.[1]  Under the Fourth Amendment, people are guaranteed the right to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, and search warrants are to be issued only upon probable cause.[2]  Because the Fourth Amendment itself contains no enforcement mechanism, the exclusionary rule developed as a judicially-created remedy to

---

[1]     *United States v. Oliver*, 630 F.3d 397, 405 (5th Cir. 2011); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).

[2]     *Club Retro, LLC v. Hilton*, 568 F.3d 181, 195 (5th Cir. 2009).

safeguard Fourth Amendment rights.[3]   In general terms, the exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure[4] and thereby deters police misconduct.[5]   Under the fruit of the poisonous tree doctrine, all evidence derived from an illegal search or seizure must be suppressed unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.[6]

"Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of her constitutional rights."[7]   When the government performs a warrantless

---

[3]      *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2426 (2011).

[4]      *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012); *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001).

[5]      *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005).  See, also, *Davis v. United States*, 131 S. Ct. at 2426 ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations.")

[6]      *United States v. Jones*, 234 F.3d 234, 243–44 (5th Cir. 2000); *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

[7]      *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).  See, also, *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993); *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992).

search or seizure, however, the burden shifts to the government to prove by a preponderance of the evidence that the search or seizure was constitutional.[8]

1.   **The police officers' initial contact with Reed at the high school was not a traffic stop.**

In his motion to suppress, the defendant characterized his initial encounter with Opelousas Police Department officers at Opelousas High School on September 30, 2014 as a traffic stop.  The Fifth Circuit has explained that there are three types of encounters between police and individuals, each of which has different ramifications under the Fourth Amendment.[9]  The first type is a consensual encounter, in which an individual willingly agrees to speak with police officer and which may be initiated by the police without any objective level of suspicion.  The second type is the investigative stop, also known as a *Terry* stop, based on the analysis used by the Supreme Court in *Terry v. Ohio*.[10]  Under *Terry*, certain seizures are justifiable if there is articulable suspicion that a person has committed or is about to commit a crime.  Traffic stops are analyzed under *Terry*.  The third type of encounter is an arrest, which is a Fourth Amendment seizure and must be based on probable cause.

---

[8]      *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012); *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005), *United States v. Guerrero–Barajas*, 240 F.3d at 432.

[9]      *United States v. Cooper*, 43 F.3d 1040, 145-46 (5th Cir. 1995).

[10]     *Terry v. Ohio*, 392 U.S. 1 (1968).

In this case, the defendant was not arrested at the high school.  Therefore, his encounter with the Opelousas police officers was either a consensual encounter or an investigative stop.

A traffic stop is a variety of the *Terry* stop.  Although considered to be a seizure within the meaning of the Fourth Amendment,[11] a traffic stop is reasonable if:  (1) the officer's action was justified at its inception, and (2) the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.[12]  For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion – before stopping a vehicle – that some sort of illegal activity, such as a traffic violation, has occurred or is about to occur.[13]  To determine whether the officer had reasonable suspicion, a court must examine the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.[14]  Reasonable suspicion sufficient for a traffic stop requires a minimal level of objective justification

---

[11]     *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Jones*, 234 F.3d at 239.

[12]     *Terry v. Ohio*, 392 U.S. at 19-20; *United States v. Grant*, 349 F.3d at 196.

[13]     *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

[14]     *United States v. Lopez-Moreno*, 420 F.3d at 430; *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

that is somewhat less than probable cause.[15]  Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure.[16]  Even if done under pretext, a police officer may stop a vehicle based on traffic violations that he observes.  "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."[17]

In this case, Lt. LeBlanc did not cause the defendant to stop his vehicle.  To the contrary, Lt. LeBlanc followed the defendant as he drove his vehicle to the high school.  After parking in the lot at the high school, the defendant exited the vehicle. It was only after the defendant had already gotten out of his truck at the high school that Lt. LeBlanc and Officer Pickens arrived at the high school, exited their vehicle, and initiated contact with Reed.  Accordingly, the initial encounter between the defendant and the officers was not a traffic stop, and the constitutional analysis applicable to traffic stops does not apply in this case.

---

[15]     *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

[16]     *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006); *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002).

[17]     *United States v. Sanchez–Pena*, 336 F.3d 431, 437 (5th Cir. 2003), citing *Wren v. United States*, 517 U.S. 806, 813 (1993).

-11-

This Court finds that the defendant's initial encounter with Lt. LeBlanc and Officer Pickens was nothing more than a consensual encounter. The policemen approached the defendant as he was walking on the high school campus, and they engaged him in conversation regarding his truck. He spoke with them willingly. There is no evidence that this encounter was anything other than a cordial, voluntary exchange. The police officers permitted the defendant to go into the school and take care of the business that he had there. They allowed him to use his cellphone while they were speaking with him. They did not arrest the defendant, they did not read him his *Miranda* rights, and they did not detain him in any way. They merely asked him some general questions based on their suspicion that his vehicle might have been used in the robbery of the Family Dollar Store. Even when police have no basis for suspecting a particular individual, they may generally question that individual, ask to see his identification, and request permission to search his belongings, so long as they do not convey a message that compliance with their requests is required.[18] That is precisely what occurred. Lt. LeBlanc and Officer Pickens explained to the defendant that they thought his truck might have been used in a robbery, they asked him some general questions concerning his employment and criminal history, they asked to see his driver's license, and they asked if he had a weapon in the truck. By

_____

[18]     *United States v. Cooper*, 43 F.3d at 145.

mentioning his brother-in-law's occasional use of the truck, the defendant provided a reasonable explanation for why the truck might have been involved in the robbery but the defendant himself not involved.  Consistently, Lt. LeBlanc viewed the truck as evidence related to the robbery of the Family Dollar Store but did not immediately suspect that the defendant participated in that crime.  The officers did not raise their voices, they did not draw their weapons, they did not threaten the defendant or coerce him into cooperating with them.  The questions asked, the length of the encounter, and the defendant's willingness to talk with the police officers indicate that this was a consensual encounter that did not trigger any Fourth Amendment protections.

However, even if the encounter between the defendant and the police officers had not been a consensual encounter, the police officers would have been justified in making an investigative stop.  A tip or an alert such as the BOLO in this case may provide the reasonable suspicion necessary to justify an investigatory stop.[19]  As indicated below, the BOLO  provided reasonable suspicion for the police officers to question the defendant.  Therefore, even if the defendant's initial encounter with the police officers at Opelousas High should properly be categorized as an investigative

---

[19]      *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013); *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009); *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999).

stop rather than a consensual encounter, it still did not violate the defendant's Fourth Amendment rights.

A short investigative stop or *Terry* stop of an individual does not violate a person's Fourth Amendment rights if it is based on a reasonable suspicion of criminal activity.  "A '*Terry* stop' permits the police, in recognition of their obligation to enforce the law, to effect stops and to pursue short, limited investigations infringing upon an individual's freedom of movement where they reasonably suspect criminal activity based upon something less than probable cause to arrest."[20]  A police officer does not need to have probable cause or exigent circumstances to initiate a *Terry* stop; instead, a police officer who has an objectively reasonable suspicion that a person is involved in criminal activity may detain the individual temporarily and question him to verify or dispel his suspicions.[21]  The search for and seizure of weapons that might endanger the investigating officer or others in connection with a *Terry* stop is reasonable and does not violate a person's Fourth Amendment rights. Explaining these concepts, the Supreme Court said:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons

---

[20]  *Duggan v. City of League City, Tex.*, 975 F. Supp. 968, 972 (S.D. Tex. 1997).

[21]  *Florida v. Royer*, 460 U.S. 491, 498 (1983).

-14-

> with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.[22]

In this case, the police officers observed the defendant driving a vehicle that met the description of a vehicle suspected to have been used in a robbery. This gave them reasonable suspicion that the defendant might be connected to the crime. The officers were justified in asking some general questions, including whether there was a weapon in the truck. The defendant readily responded that there was a black handgun on the back seat of the truck. The officers asked the defendant if he was willing to go to the police station to answer more questions, and he stated that he was. He offered to drive his truck to the station, but the officers were justified in requesting that they drive the vehicle instead. They were concerned that, if the defendant turned out to be involved in the robbery, he might try to escape and they were also concerned with preserving the evidentiary value of the truck. The

---

[22] *Terry v. Ohio*, 392 U.S. at 30-31.

defendant gave permission for a police officer to drive the truck to the police station. Since a police officer was going to be driving the truck, it was logical that the officers, concerned with their own safety and that of other nearby persons, would want to identify any weapons in the truck and then remove them from the truck.  The defendant consented to this procedure.  He told the officers there was a gun on the back seat, and he gave them permission to retrieve it.  The officers did not conduct a search of the vehicle.  Because there was no search, the retrieval of the gun did not trigger the defendant's Fourth Amendment rights.

The defendant rode with Lt. LeBlanc in Lt. LeBlanc's vehicle to the police station.  Lt. LeBlanc briefly frisked the defendant before he got into the vehicle.  This was permissible because it was designed to protect Lt. LeBlanc's safety.  However, the defendant was not handcuffed, and he was not made to ride in the back seat of the vehicle but was permitted to ride in the front passenger seat.  There is no evidence that the defendant had reason to believe that he was not free to go at any time during the encounter at the high school.  The officers did not arrest the defendant, did not handcuff him, did not tell him that he was not free to go.  They permitted him to use his cell phone.  Although they did not return his driver's license to him until after leaving the high school, there is no indication that this was done in order to prevent the defendant from leaving.  Furthermore, the defendant could have called someone

-16-

to come pick him up rather than going with the police officers to the station.  Instead, he voluntarily agreed to accompany the officers to the police station.  The brief frisk to assure that he was not armed did not infringe on the defendant's Fourth Amendment rights nor did any of the officers' other actions.

Accordingly, if the defendant's initial encounter with Lt. LeBlanc and the other Opelousas police officers was an investigative stop rather than a consensual encounter, it did not violate the defendant's Fourth Amendment rights.

## 2.   <u>Was the officers' initial contact with the defendant at the high school justified?</u>

The defendant contends that the police officers violated his constitutional rights during their initial contact with him at the high school because the BOLO for the truck was an inappropriate basis for stopping him, detaining him, questioning him, and taking him into custody at the police station because no one suggested that the red truck was involved in the robbery of the Family Dollar Store, only that it was parked near the robbery site at the time of the robbery.  The defendant also argues that the BOLO had grown stale by the time he was stopped.

On the night that the Family Dollar Store was robbed, a person residing in the immediate vicinity observed a distinctive vehicle in the area.  That same vehicle was captured on surveillance videos.  The vehicle was distinctive because it was red, it

had chrome rims on the wheels, it had high intensity headlights, and it had a front license plate, which is not required in Louisiana.  The witness and the videotapes also documented the fact that the distinctive vehicle was parked about a block away from the Family Dollar Store, in the parking lot for a professional office that was not open for business at approximately 10:00 p.m., and that the vehicle's occupant left the vehicle on foot then returned shortly thereafter.  The proximity of the vehicle to the robbery site and the lack of a logical connection between the vehicle and the professional office where it was parked were sufficient to create a suspicion that the vehicle and its driver might have some involvement with the robbery.  The police department issued a BOLO for the truck.

A tip or an alert such as this BOLO may provide the reasonable suspicion necessary to justify an investigatory stop.[23]  Whether a particular tip or BOLO report provides a sufficient basis for an investigatory stop depends upon a number of factors, including the credibility or reliability of the source of the information set forth in the BOLO, the specificity of the information contained in the BOLO, the extent to which the information in the report can be verified by officers in the field, and whether the report concerns active or recent activity, or has instead gone stale.[24]

---

[23]     *Davila v. United States*, 713 F.3d at 258; *United States v. Rodriguez*, 564 F.3d at 742; *United States v. Gonzalez*, 190 F.3d at 672.

[24]     *United States v. Gonzalez*, 190 F.3d at 672.

In this case, the information used to describe the red truck seen near the Family Dollar on the night of the robbery came from two reliable sources – an eye witness who called in a report to the police and surveillance videotapes from a local business. The information was very specific – the color of the vehicle, the chrome rims, the headlights, the front license plate – and these identifying details were easily verifiable by the officers who observed the defendant's truck exiting the interstate in Opelousas on September 30, 2014. "[T]he Fourth Amendment does not require that a BOLO specifically include a vehicle's license plate number or registration information."[25] Thus, the first three factors all weigh in favor of finding that the BOLO was sufficient to justify an investigatory stop.

Finally, despite the defendant's argument to the contrary, this Court also finds that the BOLO had not gone stale. Staleness is determined by evaluating the facts of each case and not mechanically counting some arbitrary amount of time between the date when the tip is received and the date when the tip is used.[26] Instead, the nature of the tip or BOLO and the nature of the alleged criminal activity must be evaluated to determine whether the tip or BOLO is stale.[27] In this case, the reliability of the

---

[25]   *United States v. Rodriguez*, 564 F.3d at 742.

[26]   *United States v. Gonzalez*, 190 F.3d at 673; *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir. 1984).

[27]   *United States v. Gonzalez*, 190 F.3d at 673.

information contained in the BOLO and the ease of objective verification of that information upon observation of the vehicle weigh in favor of finding that the BOLO was not stale.

Furthermore, in at least two cases, the Fifth Circuit has found that tips that were approximately two months old had not gone stale.[28]  In this case, the robbery at the Family Dollar Store occurred just eight days before Lt. LeBlanc observed the defendant's vehicle, concluded that it matched the vehicle described in the BOLO, and followed it to the high school.  The objective information set forth in the BOLO describing the truck did not change between the evening of the crime and the day, just a week later, that the truck was observed and followed by Lt. LeBlanc.  Certainly, the law enforcement officials in Opelousas were still interested in solving the robbery at the Family Dollar Store as well as the two earlier robberies to which it was linked through eye witness descriptions of the perpetrator and the similarity of the crimes. Therefore, this Court finds that Lt. LeBlanc's observation of a vehicle that seemed to satisfy the description set forth in the BOLO provided a sufficient basis for him to initiate an investigative stop of the defendant at the high school.

---

[28]      *United States v. Gonzalez*, 190 F.3d at 673; *United States v. Villalobos*, 161 F.3d 285, 290 (5th Cir. 1998).

### 3.      Did the retrieval of the defendant's handgun from the vehicle violate the defendant's constitutional rights?

As noted above, law enforcement officers conducting an investigatory stop may search the area if a reasonably prudent officer would believe that there is danger to persons on the scene.  Such a search should be aimed at protecting the law enforcement officers and others on the scene and should last no longer than is necessary to dispel the suspicion of danger.[29]  In this case, however, the defendant's vehicle was not searched at the high school.  The police officers requested permission to retrieve the handgun from the back seat of the vehicle, and permission was given by the defendant for that procedure.  There was no search for the handgun – other than Officer LeBlanc's having to unwrap the gun from the clothes in which it was covered – consequently, there was no Fourth Amendment violation.  Furthermore, the Fifth Circuit has held that police officers are justified in personally retrieving items from a vehicle when concerned for their own safety.[30]

---

[29]      *Davila v. United States*, 713 F.3d at 259.

[30]      See *United States v. Coleman*, 969 F.2d 126, 132 (5th Cir. 1992) (the defendant told officers that his license was in a pouch inside his car, and the officers were justified in retrieving it themselves to ensure the pouch did not contain a weapon).

**4.      Did the defendant freely and voluntarily consent to the search of his truck?**

To the extent that the retrieval of the handgun from the truck might be categorized as a search, that search was consensual and consequently did not violate the defendant's Fourth Amendment rights.  Consent is as an exception to the Fourth Amendment's requirement that searches be supported by warrants.[31]   When a warrantless search is conducted pursuant to consent, the government must prove, by a preponderance of the evidence, that consent was freely and voluntarily given.[32]  Consent is not voluntary if it "was the product of duress or coercion, express or implied."[33]  Whether consent was voluntary is a question of fact to be determined from the totality of the circumstances.[34]   The court must consider six factors in evaluating the voluntariness of a person's consent to search, all of which are relevant, but no one of which is dispositive or controlling.[35]   The six factors are:   (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4)

---

[31]      *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997).

[32]      *United States v. Tompkins*, 130 F.3d at 121.

[33]      *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

[34]      *Schneckloth v. Bustamonte*, 412 U.S. at 227.

[35]      *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005); *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993); *United States v. Gonzales*, 842 F.2d 748 (5th Cir.1988).

the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[36]

In this case, the defendant was not in custody when his handgun was retrieved, no coercive police procedures had been used, and the defendant was fully cooperating with the police.  There is no indication that he was unaware of his right to refuse consent, his intelligence was obvious from his conversation with the police officers, and he readily admitted that a handgun would be found on the back seat of the vehicle.  He had been allowed to enter the high school to do business there without police interference, and he had been permitted to use his cell phone throughout his encounter with the police officers.  The totality of the circumstances mandate a finding that, to the extent that a search of the vehicle occurred at the high school, that search took place only after the defendant voluntarily consented to the search. Accordingly, there was no Fourth Amendment violation.

<u>CONCLUSION</u>

For the reasons set forth above, it is recommended that defendant Carey Wardell Reed's motion to suppress (Rec. Doc. 23) be DENIED.

---

[36]     *United States v. Santiago*, 410 F.3d at 199; *United States v. Olivier–Becerril*, 861 F.2d 424, 426 (5th Cir. 1988).

-23-

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court, shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

Signed at Lafayette, Louisiana, this 28th day of December 2015.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE


COPY SENT:

DATE: ___12/28/2015___
BY: _____EFA_____
TO: _____RTH_____
pj

-24-